Huntington Land Company *et al. v.* Azel Meadows *et al.*

(No. 7120, 7120-A, 7120-B)

Submitted March 31, 1932.   Decided April 12, 1932.

*G. M. McLaughlin* and *Marcum, Lovins & Gibson,* for appellant Annie E. Krinker.

*T. W. Peyton* and *Marcum, Lovins & Gibson,* for appellants Martha and C. D. Waldeck.

*Vinson, Thompson, Meek & Scherr,* for appellants Prudential Ins. Co. of America and C. W. Freeman, trustee.

*G. M. McLaughlin,* for appellee Mortgage Security Corporation of America.

*Brown, Jackson & Knight,* and *Joseph P. Douglass,* for appellees Huntington Land Co. and J. P. Douglass, trustee.

*Scott, Graham & Wiswell,* for appellees Alex Wolf and Alex Wolf & N. A. Oppenheim, Inc.

*T. W. Peyton, for appellees* Walter O. Moore, Virginia Moore, and Mattie O. Praither.

*McClure & Winters,* for appellee Jackson Building & Loan Ass'n.

*Fitzpatrick, Brown & Davis* and *McDaniel Purcell,* for appellees Thomason and Lohman, trustees.

*John E. Jenkins,* for appellee State-Planters' Bank & Trust Co.

*Walter M. Parker* and *George S. Wallace,* for appellees Buckeye Savings & Loan Co., Annie E. Danforth, and Geo. S. Wallace, trustee.

*Livezey, Hogsett & McNeer* and *John T. Delaney,* for appellees H. E. Pilcher and others.

LIVELY, JUDGE:

This suit by plaintiff, Huntington Land Company, hereinafter called "Land Company" is to cancel certain recorded releases of its deed of trust lien on certain lots in the City of Huntington; and to sell the lots in discharge of said lien. Eighty-three lots are involved, and the final decree directs a sale of them in the inverse order of their alienation until plaintiff's lien is paid.

On April 1, 1921, the Land Company deeded to Azel Meadows Realty Company (a corporation owned by Azel Meadows) hereinafter called "Meadows", a parcel of land designated on the official map of Huntington as Block 264. This parcel was 390 by 920 feet. The price was $52,000 of which Meadows paid $2,000 cash and executed seven notes for the remainder, one of which notes was for $3,000 at three months, and the other six for $7,833.33-1/3 each at 6, 12, 18, 24, 30 and 36 months, respectively; and payment thereof secured by contemporary deed of trust on the land, to J. P. Douglass, trustee. Meadows divided the land into 120 lots, made survey and map of the same as "Azel Meadows Subdivision of Block 264 Highlawn," recorded the map, and delivered a copy to the Land Company which agreed with Meadows to release its lien upon the lots as they were sold by him, upon payment to it of $700 for a corner lot and $500 for an inside lot. The Land Company marked on the map

delivered to it the lots which it released from its lien. On September 22, 1922, a release of the lien on lots 4 to 10, inclusive, lots 17, 19, 20, 24 and 44 to 60, inclusive, was recorded in the county clerk's office; on October 6, 1922, a similar release of lots 18 and 62 to 80, inclusive; on December 15, 1922, a like release of lots 80 and 82 to 87, inclusive; and on December 22, 1922, a like release of lots 40, 81 and 94 to 119, inclusive, was also recorded in said clerk's office. Sometime in January, 1923, a prospective purchaser asked the Land Company if it had released its lien on a certain lot, and being answered in the negative he advised it that there must be some mistake because the county clerk's record showed a release on that lot. Immediately, the assistant secretary of the Land Company went to the county clerk's office and inspected the recorded releases. He found that 63 lots had been fraudulently inserted in the recorded releases. The fact was that 78 lots had been fraudulently inserted in the releases plainly shown on the releases. He said he did not discover that the release recorded September 2, 1922, (dated August 22, 1922) included 15 lots, namely those from 44 to 60. He had called to his assistance in the examination of the record a deputy clerk who called off the numbers of the lots released while he (the assistant secretary) marked them down, and he understood the deputy clerk to read the number as 44 *and* 60, instead of 44 *to* 60 as it read on the recorded paper. The Land Company had released only lot 19 by the release recorded September 22, 1922; lot 18 by the release recorded October 6th; lot 80 by the release recorded December 15th; and lot 40 by the release of record December 21st. The Land Company claims that it released one lot by each of its four releases delivered to Meadows; namely lots 19, 18, 80 and 40, and that the other lots enumerated in the releases had been fraudulently inserted. It did not discover that 15 of the lots in the first recorded release had been fraudulently inserted because its assistant secretary had misunderstood the deputy clerk, or the deputy clerk had miscalled the numbers of the lots released when the investigation of the fraud was made in January, 1923.

Upon discovery of the fraud, the Land Company immediately called in Meadows who denied any knowledge of it, but admitted there was some mistake. A careful calculation was then made of the amount of money Meadows owed to the Land Company on the lots fraudulently released of its lien (that is on 63 lots because it then did not know that 15 more had been released as above set out), which amounted to about $27,900, and which Meadows agreed to pay, and did·pay within about four months of that time. The Land Company and Meadows kept the discovery of the fraud a profound secret, and the deputy clerk was enjoined to secrecy by the Land Co. Meadows continued to market the lots and between the time of the discovery of the fraud up to November, 1927, paid to the Land Company a further sum of $13,099.94 on his notes and interest thereon, and the Land Company executed and delivered releases for the lots sold by him during this period according to their agreement for partial releases of the lien. In October, 1927, the Land Company claims to have discovered the fraudulent release of its lien on the 15 lots (from Nos. 45 to 59). It then attempted to have Meadows pay money to meet these releases, as he had done on the 63 lots, and he could not pay money, but tendered notes of other persons in payment, which plaintiff's executive committee declined to accept, and these tendered obligations were turned over to the trustee in its deed of trust, who afterwards, in 1928, delivered them to the trustee in the bankrupt proceeding against Meadows.

About the first of 1928 Meadows and his realty company became bankrupt and were so adjudged. This suit was begun in 1928, the bill being filed at June Rules. The rights of three groups of persons are involved: (1) those who purchased the 63 lots fraudulently released, and the fraud discovered in January, 1923, their assigns and lien creditors; (2) those who purchased the 15 lots (Nos. 45 to 59, inclusive) their assigns and lien creditors; and (3) those who purchased 5 lots (Nos. 3, 23, 91, 92 and 93) on which there was no release either fraudulent or valid. This group of five was purchased with plaintiff's trust lien thereon unimpaired so far as the county records disclosed. When this sub-

division was opened up for sale in 1921 and until the latter part of 1927, real estate in the city appears to have been in demand and these lots sold for good prices ranging from $1,400 to $2,000 and many houses were built on them and other substantial improvements made. Loans on the lots and improvements were made of more than $200,000, secured by liens thereon. Many of the lots were sold and resold, all relying upon the validity of the releases here involved, and the unencumbered title of Meadows as shown by the public records. For brevity, the rights of each of the three groups will be discussed as groups.

Up to January, 1923, the Land Company had executed and delivered four valid releases, and at that time it became aware by actual inspection of the recorded releases that each of them had been changed and its trust deed lien released on other lots named therein by their proper numbers. It knew that Meadows was pushing the sale of all these lots, and that buildings were being erected on the subdivision; and that purchasers would rely upon the clear title shown by these releases that plaintiff had released its lien in the statutory manner. Then was the time for it to proclaim the fraud, if it desired to enforce its trust deed lien against any of the lots so released. Surely equity will not permit it to allow innocent persons to lose their property under such circumstances. Of course, a person is not estopped by the act of another, if he does not know that act. But where he has knowledge and fails to speak knowing that the rights of others will be lost by his silence, he should not be heard to complain. When plaintiff ascertained that 63 lots had been released from the lien, and remained silent, if it did not participate in the fraud, it permitted the rights of innocent purchasers to intervene, and is estopped from asserting its lien as against them. It may have been prudent from a business standpoint to keep silent for the benefit of Meadows; and also for its own benefit for the full success of Meadows' adventure would bring to it the balance of its $50,000 of purchase money. But its protection of Meadows and the forwarding of its own interests, should not stand at the expense of other innocent parties. A litigant must show clean

hands when he comes into a court of equity. But it is argued that the fraudulent release of the 15 lots was not discovered until 1927 and therefore plaintiff has not lost its lien on these lots because of its ignorance of the fact of release. The release of these lots was in the first release executed by plaintiff on August 22, 1922, and recorded September 22, 1922. The insertion of lots 44 to 60 (the 15 lots) was plainly shown thereon. Plaintiff's assistant secretary examined this recorded paper for the sole purpose of ascertaining the lots fraudulently released, but claims, as an excuse for non-discovery, that the call of the numbers entrusted to the deputy clerk was misunderstook or miscalled. He looked at a paper with plain fraud on its face for the purpose of discovering fraud, and only discovered partial fraud. "Negligence is not fraud, though it may be evidence of it. * * * By negligence is meant the want of that reasonable degree of diligence and care which a man of ordinary prudence and capacity would be expected to exercise in the same circumstances." Vol. 1, Jones on Mortgages, 977. After a person has obtained knowledge of fraud, or has been informed of facts and circumstances from which such knowledge would be imputed, he must act within reasonable time on penalty of being debarred of equitable remedy. This rule applies only when the fraud is known, *or ought to have been known.* Vol. 2, Pom. Eq. Jurisprudence (3rd Ed.), sec. 917. The fraud as to these 15 lots ought to have been known; it was looked for, was plainly evident, and was not found. We think knowledge of its existence can be imputed to plaintiff. *Realty Co.* v. *Lindsey,* 91 W. Va. 127, 112 S. E. 306, and citations. "Where a person is charged with notice or actually knows, of an instrument, he is also charged with notice of all facts appearing on the face of the instrument or to the knowledge of which any thing there appearing would conduct him." 20 R. C. L., 353. It appears that every one of those 15 lots, except lot 54, had then been sold by Meadows, at the time the investigation of the fraud was made, and the deeds recorded. Plaintiff's investigator apparently did not look to this part of the public record. But the fact that fraud was admittedly discovered as to the 63 lots and kept

secret for reasons above stated, denies to plaintiff assertion of its lien against the 15 lots, for if that known fraud had been promptly repudiated (not connived at and kept secret) the fraud as to the 15 lots would have been discovered by all at a time when Meadows was admittedly solvent and able to save loss to all concerned. No one but Meadows would have suffered. "If one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent." 2 Pom. Eq. Jurs (1st Ed.), sec. 818. Plaintiff is estopped by its conduct from asserting its trust deed lien against the 63 and 15 lots, and the decree holding them liable to that lien and directing their sale in satisfaction thereof is erroneous.

Can plaintiff assert its lien against the 5 lots (Nos. 3, 23, 91, 92 and 93) on which its lien has not been released fraudulently or otherwise? No citation of authority is necessary for the established rule that all of these lots should be sold in the inverse order of their alienation, if plaintiff had not been estopped from asserting its lien against a part of them. The last sold should be first subjected to payment of the lien. This rule is a part of the equitable doctrine of contribution and exoneration. 3 Pom. Eq., sec. 1224. But the 63 and 15 lots cannot be sold in satisfaction of the lien for reasons above stated. Shall the remainder of the purchase money secured by the trust deed lien ($13,150.65) fall on these 5 lots? It would be inequitable to make these 5 lots pay all of that debt. It is inequitable to require any of the 78 lots (63 plus 15) to be sold for plaintiff's benefit. How then shall the equities be balanced? Plaintiff has lost its remedy against the 78 lots, and because of its secretion of the fraud by which it lost remedy against them, it should lose to that extent its remedy against the 5 lots. Therefore whatever sums it could have realized from those of the 78 lots sold by Meadows subsequent to the sale of the 5 lots (and which would have been first subjected to sale before the 5 lots if there had been no fraud) should be credited on the balance of the purchase money due plaintiff, and if any balance is left, then the 5 lots should be subjected to that balance in the inverse order of their alienation. If

there had been no fraud, all of the lots would be subject to sale in the inverse order of their alienation by Meadows. The equities can best be balanced and justice preserved by adhering to the rule of inverse order of alienation, which the decree does; but sale of any of the 78 lots not being possible for reasons above set out, plaintiff will not be permitted to recover against the 5 lots any sum it could have realized from those of the 78 lots alienated subsequent to the sale of the 5 lots. The lots in the 78 class (63 plus 15), sold subsequent to the lots in the 5 class, stand as a barrier for the protection of the lots in the 5 class against plaintiff's lien, and the owners of the five lots have done no act by which they lost that protection barrier, and are entitled to preservation of that protection in a court of equity. It is stated in one of the briefs (we have not verified the statement) that 30 of the 78 lots were alienated by Meadows subsequent to the sale by him of the 5 lots. In *Jones* v. *Myrick,* 8 Gratt. (Va.) 180, lands on which there was a judgment lien were aliened in parcels, and the judgment lienor by his conduct was estopped from asserting his lien against the parcel last alienated, which he would have been required to first subject to sale for his lien, if he had not been estopped, and it was held that he was not entitled to subject the lands next liable for the whole amount of his lien, but only for the balance after crediting the value of the land first liable. That decision is binding authority on this court, and we are not disposed to reverse or modify it, because it is based on equity and sound reason.

Cross-error is assigned by the Land Company because of certain liens on lots 91, 92, 93 and 50 decreed to be prior in dignity to that of plaintiff's lien. Under the reversal here made and the principles governing the assertion of plaintiff's lien, perhaps the cross-assignment is moot, and not necessary to be considered.

The decree is reversed and the cause remanded.

*Reversed and remanded.*